UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| DARREN A. PALMER, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:12-cv-162 |
| v. | ) | |
| | ) | *Mattice / Lee* |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Darren A. Palmer brought this action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying him disability insurance benefits ("DIB"). Plaintiff has filed a motion for judgment on the pleadings [Doc. 10] and Defendant has moved for summary judgment [Doc. 14]. Plaintiff alleges the Administrative Law Judge ("ALJ") did not adequately consider Plaintiff's subjective complaints and improperly relied upon statements that were not opinions of his treating cardiologist. For the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for judgment on the pleadings [Doc. 10] be **DENIED**; (2) the Commissioner's motion for summary judgment [Doc. 14] be **GRANTED**; and (3) the decision of the Commissioner be **AFFIRMED**.

I. **ADMINISTRATIVE PROCEEDINGS**

Plaintiff initially filed his application for DIB on December 19, 2008, alleging disability as of October 18, 2008 (Transcript ("Tr.") 101-02). Plaintiff's claim was denied initially and upon reconsideration and he requested a hearing before the ALJ (Tr. 44-49, 52-57). The ALJ held a hearing on July 1, 2010, during which Plaintiff was represented by an attorney (Tr. 24-41). The ALJ issued his decision on August 19, 2010 and determined Plaintiff was not disabled because there were

jobs in significant numbers in the economy which he could perform (Tr. 9-20). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-3). Plaintiff filed the instant action on May 21, 2012 [Doc. 1].

## II.     FACTUAL BACKGROUND

### A.     Education and Background

Plaintiff was 51 at the time of the hearing before the ALJ and had completed the eleventh grade (Tr. 30, 120). Plaintiff testified he stopped working in October 2008 due to his heart problems but had previously worked as a truck driver from 1982 to 2008 (Tr. 31). Plaintiff testified it took little activity to make him totally out of breath and fatigued; he tried to exercise on a treadmill but could only do so for about five minutes (Tr. 34-35). Plaintiff had smoked cigarettes prior to his first heart attack (Tr. 35). The ALJ summarized Plaintiff's symptoms as periodic chest pains, shortness of breath and easy fatigue, and Plaintiff agreed with this summary (Tr. 37). Plaintiff testified he could not work an eight hour a day job unless it involved a lot of sleeping (Tr. 37). Plaintiff further testified his cholesterol medication made him sleepy, which was problematic when he was supposed to take the medication at night and was also driving a night shift (Tr. 37-38).

Plaintiff recounted his recent hospital visit for the ALJ and reported that Dr. Monroe told him if he had chest pain, he should take a nitroglycerin pill and wait 15 minutes to see if the pain diminished, if not, he should take another and wait another 15 minutes, and so on up to three pills; eventually the pain did not go away so he went to the emergency room (Tr. 38-39). The doctors had conflicting opinions on whether Plaintiff had had another heart attack (Tr. 39). Plaintiff testified he was not performing any activity at the time the chest pain occurred and was just sitting at home watching television (Tr. 39). Plaintiff testified he had to go through the course of taking one or two

nitroglycerin at least twice a month (Tr. 40).

   B.   **Medical Records**

Plaintiff began following with his primary care physician, Dr. Dennis Thompson, in March 2008 following a myocardial infarction while working out of state. Plaintiff was not taking Plavix or Zocor at the time due to problems affording the medications and Dr. Thompson told him definitively that he must take Plavix (Tr. 261-62). Dr. Thompson noted coronary artery disease, hyperlipidemia, smoking addiction, and noncompliance and recommended Plaintiff be off work for a month (Tr. 261). Plaintiff was admitted to the hospital on March 12, 2008 complaining of chest pain; a scan of Plaintiff's chest was normal (Tr. 156, 185-86, 193-200). Plaintiff reported a prior myocardial infarction and catheterization and stent procedures and stated he had chest pain off and on since the procedure and discharge; his most recent pain had radiated to his left arm even at rest (Tr. 174-75). A cardiac catheterization was performed on March 12 (Tr. 185-86, 286-87).

Plaintiff was admitted to the hospital again on March 16, 2008 and a scan of his chest was normal (Tr. 157, 172, 176-79, 202-09). Plaintiff reported admission to a Florida hospital two weeks prior with myocardial infarction, further chest pain after those procedures, and intermittent chest pain following his last hospital visit that consisted of a dull, almost constant ache in his left chest (Tr. 176). The pain radiated across his chest and up his neck and down his arms and the most recent pain could not be controlled by nitroglycerin (Tr. 176). Plaintiff reported shortness of breath on exertion and stated he was unable to walk 10 feet, but had no problems lying flat (Tr. 177). The EKG performed March 18, 2008 revealed no specific etiology for Plaintiff's chest pain (Tr. 255, 284-85). Plaintiff was prescribed aspirin and oxycodone for pain and inflammation (Tr. 178).

Plaintiff filled out a fatigue questionnaire on March 30, 2008 and wrote that he took two or

three naps of varying length each day, was helping to care for his wife and their pets, doing the grocery shopping once a week, and doing laundry (Tr. 138-39). Plaintiff stated he could be on his feet for 30 minutes to an hour at a time but then needed to rest for two or three hours, and chores took him a while to complete (Tr. 138-39). Plaintiff drove and attended doctor's appointments, but stated he was unable to work because he could not take naps at any job (Tr. 139).

Plaintiff saw cardiologist Dr. Van Monroe on April 10, 2008 and Dr. Monroe noted Plaintiff's recent hospitalization for atypical chest pain and diagnosis of pericarditis, but Plaintiff reported doing well since then and having fleeting chest pain that lasted for 30 seconds at a time and usually occurred at rest; low-level activity did not cause symptoms (Tr. 281-82). Plaintiff also had shortness of breath in the process of laying down that quickly resolved (Tr. 281). Dr. Monroe planned to evaluate with an EKG to ensure there was no significant pericardial effusion and a Holter monitor (Tr. 282).

Plaintiff returned for a follow-up appointment with Dr. Thompson on April 15, 2008 and requested he be released to work and stated he felt fine and had had no chest pain or shortness of breath (Tr. 260). Plaintiff was taking Plavix and other medication but was under stress with possible foreclosure (Tr. 260). Plaintiff was scheduled for a treadmill stress test on April 21, 2008 and did not show, but the test was performed April 22, 2008 and showed ST segment depression (Tr. 260, 263-68). Dr. Thompson spoke to Dr. Monroe about Plaintiff's March catheterization for the first time and learned Dr. Monroe wanted to further evaluate Plaintiff for questionable Dressler's syndrome (Tr. 259-60). An EKG was performed April 29, 2008 which showed normal left ventricular function with EF 55% and mild mitral and aortic regurgitation (Tr. 256). A Holter monitor test was normal on May 1, 2008 (Tr. 165). Plaintiff returned to Dr. Thompson May 28,

4

2008 and reported laying block and being fairly active but having occasional shortness of breath (Tr. 259). Plaintiff had quit smoking and it was noted Dr. Monroe had released him to return to work June 1 (Tr. 259). On June 7, 2008, Plaintiff came in for his work-related physical and reported some continued chest pain and shortness of breath; Dr. Thompson reminded him to continue his medications and increase activity as he could tolerate (Tr. 259).

Plaintiff presented to the emergency room on June 27, 2008 complaining of chest pain and had taken six nitroglycerin in the last 24 hours; an EKG was done and was normal, but Plaintiff left without being seen by a physician (Tr. 210-11). Plaintiff presented to the emergency room complaining of persistent, squeezing chest pain on September 30, 2008 at a pain level of seven on a scale of one to ten with intermittent sharp chest pain of 10/10 lasting seconds; the pain resolved after Plaintiff received pain medication at the hospital but he still experienced intermittent sharp pains (Tr. 180-82, 213-20). Plaintiff stated the pain radiated to his left upper body and left jaw and it felt similar to his prior heart attacks (Tr. 180). A scan of Plaintiff's chest on October 1, 2008 revealed no acute disease (Tr. 158-59, 173). Plaintiff underwent a cardiac catheterization the same day and returned to the hospital the next day with swelling at the stent site (Tr. 173, 187-88, 222-25, 274-75).

Plaintiff was admitted to the hospital again on October 23, 2008 and stated he had been doing well until experiencing sudden chest pain, shortness of breath, and mild diaphoresis; his chest pain resolved with heparin, nitroglycerin and morphine (Tr. 183-84, 227-35). A scan of Plaintiff's chest showed no acute disease and no significant change from the October 1 scan (Tr. 160). Plaintiff underwent a left heart catheterization, coronary angiography, and left ventriculography on October 24 (Tr. 190-91, 272-73). Plaintiff was assessed with moderate/severe disease involving the distal

5

right coronary artery and moderate to severe ostial and proximal first diagonal disease (Tr. 191). Plaintiff returned to Dr. Thompson on November 17, 2008 and reported another heart attack October 1 and stated he was having recurrent chest pain; Dr. Thompson advised Plaintiff go to the emergency room and Plaintiff presented to the hospital complaining of chest pain that was dull, achy, squeezing, and constant, and shortness of breath (Tr. 245-53, 258). A scan revealed pulmonary hyperexpansion due to mild expansion of the lungs but no acute process (Tr. 161). A resting stress test the same day was normal (Tr. 162). On November 18, 2008, a test showed no focal perfusion defects to suggest acute stress induced myocardial ischemia (Tr. 163). Plaintiff's final diagnosis was chest pain that was likely not acute coronary syndrome (Tr. 246).

Plaintiff returned to Dr. Thompson on December 10, 2008 and reported continued chest pain and exertional dyspnea, but he wanted to return to work; Dr. Thompson said he would not sign off on releasing Plaintiff to work until his cardiologist did so, especially because he was a truck driver (Tr. 257). During Plaintiff's appointment with Dr. Monroe on December 18, 2008, Dr. Monroe noted Plaintiff had been under a lot of stress with his inability to work and was having increasing shortness of breath with exertion and chest pain with typical and atypical descriptors (Tr. 269). Dr. Monroe noted Plaintiff had been to the emergency room and was ruled out for myocardial infarction and underwent stress testing, but was low risk for myocardial ischemia and his symptoms had been stable (Tr. 269). Dr. Monroe noted Plaintiff had a lot of atypical pain and changed medication to determine whether there were other components involved (Tr. 270). Plaintiff saw Dr. Thompson again on January 8, 2009 for medication refills and reported he was planning to file for disability which Dr. Thompson thought was fine (Tr. 300).

On January 19, 2009, Dr. Christopher Thompson filled out a physical residual functional

capacity assessment and opined Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of six hours in an eight hour day, sit for a total of six hours in an eight hour day, and should avoid concentrated exposure to extreme cold, extreme heat, and fumes, odors, gases, dusts, and poor ventilation (Tr. 288-96). Dr. C. Thompson noted it was reasonable for Plaintiff to experience pain and fatigue and his symptoms appeared stable with medication, but Plaintiff still experienced chest pain and dyspnea; as a result, Dr. C. Thompson had reduced the residual functional capacity ("RFC") due to objective findings, pain and fatigue (Tr. 295). Dr. John Fields noted no change and affirmed the assessment on May 5, 2009 (Tr. 297).

Plaintiff filled out a fatigue questionnaire on January 9, 2009 and stated he took two or more naps a day, but indicated he performed all personal care activities himself, cooked, shopped, drove, visited his wife in a nursing home, and took care of all household chores and mowing (Tr. 123-24). Plaintiff also stated he ran out of energy and breath while completing activities and had to rest and could only walk about 200 feet before resting for 10 minutes (Tr. 123-24). Plaintiff wrote that he could not perform his job as a truck driver because he could not stay awake, the stress had caused another heart attack, and his doctor would not certify him to drive (Tr. 124).

Plaintiff returned to Dr. Thompson on August 4, 2009 for medication refills and stated he was doing fairly well, although he did have some intermittent chest pain; he told Dr. Thompson of the plan with his cardiologist that he would take a nitroglycerin and wait 15 minutes, take another, and then would present to the emergency room if he had to take three (Tr. 301). Plaintiff presented to Skyridge Medical Center on February 9, 2010 complaining of chest pain (7/10) that had started that day with radiation to his left arm and shortness of breath (Tr. 306-10). Plaintiff described the

7

pain as similar to his previous heart attack and reported it was worse with exertion (Tr. 306). Plaintiff's EKG showed a normal sinus rhythm and a chest x-ray revealed no acute disease (Tr. 307, 309). There was no evidence of myocardial infarction and it was suspected Plaintiff was experiencing reactive airway disease or asthma exacerbation (Tr. 309-10).

## III. ALJ'S FINDINGS

### A. Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The five-step process provides:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

B.   **ALJ's Application of the Sequential Evaluation Process**

At step one of this process, the ALJ found Plaintiff had not engaged in any substantial gainful activity since October 18, 2008, the alleged onset date (Tr. 14). At step two, the ALJ found Plaintiff had the following severe impairments: ischemic coronary artery disease with hypertension and hyperlipidemia, and possible reactive airway disease (Tr. 14). The ALJ determined these impairments were severe because they caused more than a minimal limitation on Plaintiff's ability to perform basic work activities (Tr. 14). At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 14). The ALJ specifically discussed his consideration of Listing 4.00 (Tr. 14-15). The ALJ determined Plaintiff had the RFC to perform a full range of light work (Tr. 15). At step four, the ALJ found Plaintiff could not perform his past relevant work (Tr. 19). After considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform by using the Medical-Vocational Guidelines ("Grids") (Tr. 19). This finding led to the ALJ's determination that Plaintiff was not under a disability from October 18, 2008, the alleged onset date, through the date of the decision (Tr. 19-20).

IV.   **ANALYSIS**

Plaintiff asserts two arguments. First, Plaintiff argues the ALJ did not adequately evaluate the credibility of his subjective complaints. Second, Plaintiff contends the ALJ improperly relied upon statements by his treating cardiologist that were not opinions and cannot provide substantial evidence for his decision.

**A.     Standard of Review**

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of

error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

B.  **Credibility Determination**

In Plaintiff's first argument, he asserts that because the ALJ made statements during the hearing to indicate he would not award Plaintiff benefits without an opinion from Dr. Monroe, the ALJ was predetermined to find Plaintiff was not disabled without paying attention to Plaintiff's subjective complaints [Doc. 11 at PageID# 41]. Plaintiff asserts he attempted to obtain a letter from Dr. Monroe, but he was denied access to Dr. Monroe's office due to an outstanding debt [*id.*]. Plaintiff argues the ALJ erred because he did not fulfill his duty to consider Plaintiff's subjective statements and instead dismissed them out of hand when they were supported by the objective medical evidence [*id.* at PageID# 43-45].

The Commissioner argues the objective medical evidence does not support Plaintiff's allegations of disabling limitations and he was told twice in October 2008 that he could return to work [Doc. 15 at PageID# 62]. The Commissioner points out that Plaintiff did not have a treating cardiologist opinion concerning Plaintiff's ability to work and that Dr. Thompson's note that it was "fine" for Plaintiff to file for disability was not an opinion that Plaintiff is disabled [*id.*]. The Commissioner contends that although Dr. Thompson had reservations about Plaintiff's ability to work as a truck driver, he never opined on Plaintiff's ability to perform any other work [*id.*]. Thus, the Commissioner argues Plaintiff has not established the ALJ made any errors in assessing

11

Plaintiff's credibility [*id.*]. The Commissioner further argues the ALJ did consider Plaintiff's testimony during the hearing, asked him questions, and gave Plaintiff an opportunity to explain his symptoms and the reasons he was unable to work [*id.* at PageID# 63]. The statement by the ALJ about obtaining Dr. Monroe's opinion, the Commissioner asserts, was to inform Plaintiff that there was no opinion contradicting that of the state agency physician who opined Plaintiff could perform light work and was not an indication that the ALJ was predetermined to rule against Plaintiff [*id.* at PageID# 64-65]. The Commissioner points out that the ALJ would have been required to give controlling weight to an opinion by Dr. Monroe if it was supported by the objective medical evidence, and that was the only basis behind the ALJ's comments in that regard [*id.* at PageID# 65]. The Commissioner finally argues there was no significant change in Plaintiff's condition after October 2008 and Plaintiff apparently received no treatment for several months shortly after filing for disability, which undermines his allegations [*id.* at PageID# 64].

Credibility assessments are properly entrusted to the ALJ, not to the reviewing court, because the ALJ has the opportunity to observe the claimant's demeanor during the hearing. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *See King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984) (noting the rule that an ALJ's credibility assessment is entitled to "great weight," but "declin[ing] to give substantial deference to the ALJ's unexplained credibility finding," and holding it was error to reject uncontradicted medical evidence). *See also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (ALJ was entitled to "rely on her own reasonable assessment of the record over the claimant's personal testimony"); *Barker v. Shalala*, 40 F.3d 789,

12

795 (6th Cir. 1994) (ALJ's credibility assessment is entitled to substantial deference).

The ALJ made the following statements in his opinion relevant to Plaintiff's credibility:

> I find the claimant may experience some intermittent exertional dyspnea and chest pain, secondary to his ischemic coronary disease, which restricts his ability to perform the demands of work activity. However, the record fails to show his capacity to stand/walk is so restricted as to preclude him from standing and/or walking up to six hours in a workday, or from lifting/carrying up to 20 pounds occasionally, and ten pounds frequently. The claimant's activities of daily living, along with his relative lack of medical treatment, support this conclusion. The record does not provide any credible or objective basis to warrant additional limitations in other areas of functioning.
> . . .
> After careful consideration of the evidence, I find the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> In terms of the claimant's alleged ongoing chest pain, the later record shows the claimant's stenting procedures were successful, and that his later symptoms are non-cardiac in origin, and likely derive from his history of asthma and his nearly lifelong history of tobacco abuse. . . . There is evidence that the claimant is not entirely compliant with prescribed treatment and medication, and the record shows the claimant was laying block soon after his myocardial infarction in March 2008, which requires strenuous exertion. This evidence does little to enhance the claimant's credibility, and the medical evidence of record fails to support the claimant's limitation to the extent alleged.

(Tr. 15, 17-18). The ALJ further commented on the lack of a consultative physical opinion or function-by-function treating opinion in the record and thus considered various statements in Dr. Monroe's treating notes, along with the opinion of the state agency physician, in reaching his conclusion (Tr. 18).

The Commissioner is correct in noting that the ALJ would have been required to give

13

controlling weight to the opinion of a treating physician, assuming that opinion was supported by the objective medical evidence. A treating physician's opinion is entitled to complete deference if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original). Here, however, the ALJ did not have an opinion by Dr. Monroe, Plaintiff's treating cardiologist (whose opinion would have carried the most weight) or Dr. Thompson, Plaintiff's primary care physician. Although Plaintiff finds fault with the ALJ's comments and suggestion that he obtain an opinion by Dr. Monroe because Plaintiff considers these statements an indication the ALJ was predetermined to rule against Plaintiff, I **FIND** no fault with these statements, as they were essentially designed to help, and not hurt, Plaintiff's application for benefits. It was not an indication that the ALJ was predetermined to rule against Plaintiff without hearing his subjective complaints, but was intended to provide Plaintiff with the ALJ's impressions of the case after reviewing the record. Without a treating physician opinion as to Plaintiff's functional capabilities or significant objective evidence making disabling limitations fairly obvious, there was essentially nothing to contradict the opinion of the state agency physician that Plaintiff could perform light work besides Plaintiff's own statements as to his allegedly disabling symptoms.

On that note, I further **FIND** the ALJ fulfilled his duty to address Plaintiff's credibility and **CONCLUDE** the ALJ did not err in determining that Plaintiff's subjective complaints were not entirely credible. The ALJ observed that Plaintiff had not had consistent medical treatment for his condition and was not always compliant with treatment, his activities of daily living indicated a higher level of functioning, and Plaintiff's recent chest pain did not appear to be cardiac in origin

14

and was thus not related to his heart condition, which appeared to be controlled with stenting and medication. The ALJ, as well as the Commissioner, properly noted that Plaintiff's inconsistent treatment, including a span from January 2009 to August 2009, which occurred shortly after Plaintiff filed for disability, did not support his subjective complaints. It is worth noting that after this lengthy span, Plaintiff reported doing well with only intermittent chest pain and did not seek treatment again until February 2010. In addition, it is documented in the record that Plaintiff was not always strictly compliant with medication, reported laying block and staying active to Dr. Thompson in May 2008, was encouraged to increase his activity as tolerable, and was having atypical chest pain that appeared to be non-cardiac in nature during his last few hospital visits.

Although Plaintiff claims the ALJ did not consider his testimony at the hearing, I **FIND** the ALJ adequately considered Plaintiff's symptoms as testified to during the hearing. Plaintiff was represented by counsel at the hearing and could have been asked more questions if it was pertinent to Plaintiff's claim, but there was little testimony solicited. Nonetheless, the ALJ noted in his decision that Plaintiff testified that he experienced chest pain and shortness of breath with minimal exertion, could only walk on a treadmill for five minutes at a time, that one of his medications caused nighttime drowsiness, which made it difficult for him to drive trucks at night, and he had had one occasion in the last year during which nitroglycerin had not alleviated his chest pain. The ALJ's decision indicates he evaluated these statements along with other evidence in the record to reach his conclusion. I **CONCLUDE** the ALJ did not err in his statements during the hearing or in making his credibility determination and further **CONCLUDE** his determination that Plaintiff's subjective complaints were not fully credible is supported by substantial evidence.

15

### C. Statements by Dr. Monroe

Plaintiff next argues the ALJ cited two "opinions" by Dr. Monroe in support of Plaintiff's ability to work; one from June 2008 noting Plaintiff could return to work, after which Plaintiff asserts he did return to work, and one cryptic reference to a statement that Plaintiff could return to work as a truck driver in October 2008, which does not appear in the record [Doc. 11 at PageID# 45]. Plaintiff further argues the ALJ noted he gave substantial weight to the opinion of Dr. Monroe when no such opinion by Dr. Monroe as to Plaintiff's work functioning appears in the record [*id.* at PageID# 46]. The Commissioner contends there are two statements in the record from October 2008 that indicate Plaintiff could return to work and, although the ALJ incorrectly attributed the statements to Dr. Monroe, they were made after consultation with Dr. James Hoback, a colleague of Dr. Monroe and the physician who performed Plaintiff's October 1 catheterization [Doc. 15 at PageID# 63]. The Commissioner argues that Plaintiff's inconsistent statements about returning to work undermine his allegations of a disabling condition, as he told Dr. Thompson in December 2008 that his cardiologist had released him to work, but filed for disability shortly thereafter and represented the doctors had told him to stop driving trucks [*id.* at PageID# 63-64].

The ALJ stated as follows regarding the statements from Dr. Monroe:

> Dr. Monroe, one of the claimant's treating cardiologists, opined, in June 2008, that the claimant could return to his full-time work. He again opined, pursuant to the claimant's October 2008 hospitalization, that the claimant could return to his full-time work activity (as a truck driver). Dr. Monroe is a board-certified cardiologist, he has a treating relationship with the claimant, and he relied on his own clinical findings and objective EKG, catheterization, x-ray and laboratory evidence in reaching his opinion. Therefore, I give his opinion, as the primary treating cardiologist, substantial weight.

(Tr. 18). Although Plaintiff does not believe the October 2008 statement appears in the record, the

Commissioner is correct that upon discharge from the hospital in early October and following a heart catheterization, Plaintiff was instructed that he could return to work in three days (Tr. 220, 224). The Commissioner is also correct that Dr. Monroe did not make this determination, although it does appear that a cardiologist[1] was consulted prior to Plaintiff's discharge from the hospital and theoretically had some input in his special discharge instructions. In addition, the opinion cited from June 2008 cannot be found in treatment notes of Dr. Monroe and instead appears to come from Plaintiff's report to Dr. Thompson, after which Dr. Thompson performed a work-related physical of Plaintiff (Tr. 259). Accordingly, I **FIND** the ALJ improperly characterized both statements as "opinions" from Dr. Monroe.

However, I **CONCLUDE** any error by the ALJ in classifying these statements as opinions of Dr. Monroe and affording them substantial weight was harmless error. There was little in the record from Dr. Monroe upon which the ALJ could rely as to Plaintiff's abilities and there is nothing to contradict Plaintiff's report that Dr. Monroe had released him to work as of June 2008, after which Plaintiff was able to return to work. This release occurred after tests ordered by Dr. Monroe, and it is unlikely Dr. Thompson would have performed the physical to release Plaintiff to work if Dr. Monroe had not in fact indicated release was appropriate. Besides the likelihood that this release was indeed permitted by Dr. Monroe, the ALJ may have considered this release to work significant because it followed Plaintiff's coronary events by only a few months, coincided with Plaintiff reporting increased activity, and Plaintiff's later hospitalizations appeared to implicate non-cardiac

---

[1] Although the Commissioner claims the instruction was made after consultation with Dr. Hoback, it does not appear to have been Dr. Hoback and instead appears to be Dr. Berglund, another colleague of Dr. Monroe (Tr. 223). One of Plaintiff's discharge instructions was to follow up with Dr. Hoback, but he does not appear to have been involved in Plaintiff's care at the time of discharge (Tr. 223-24).

17

pain. As for the October 2008 statements, Plaintiff *was* instructed he could return to work in three days following a hospitalization for what Plaintiff thereafter characterized as a heart attack. Even though this discharge instruction does not appear to be made by Dr. Monroe, it does appear to have involved Dr. Berglund, a colleague of Dr. Monroe at the Chattanooga Heart Institute.

Moreover, as the Commissioner noted, in December 2008, Plaintiff reported to Dr. Thompson that he desired to return to work and his cardiologists had released him to work, but Dr. Thompson informed Plaintiff he would not sign off on him returning to work *as a truck driver* until his cardiologists also signed off on it (Tr. 257). It does not appear, therefore, that any physician told Plaintiff he absolutely could not work as of December 2008; Dr. Thompson merely wanted to defer to Plaintiff's treating cardiologists before making a determination that Plaintiff could return to his past work. Following Plaintiff's statements to Dr. Thompson, there is no indication in Dr. Monroe's treatment notes from later in December 2008 that Plaintiff asked Dr. Monroe to sign off on any physical forms indicating Plaintiff could return to work or to give the green light to Dr. Thompson (Tr. 269-70). In Plaintiff's fatigue questionnaire in January 2009, however, Plaintiff wrote that his DOT doctor (presumably Dr. Thompson) would not certify him to drive trucks (Tr. 124).

Essentially, therefore, the ALJ reviewed records that contained a release to work in June 2008 following Plaintiff's heart events, a release to work in October 2008 following other potentially heart-related events, and a possible release to work in December 2008 that Plaintiff may not have followed up on because he was planning to (and did) file for disability. Under the circumstances, and given that it appears either Dr. Monroe or one of his colleagues released Plaintiff to work in both June and October 2008, I **CONCLUDE** it was not material error that the ALJ improperly characterized these statements as the opinions of Dr. Monroe. I further **CONCLUDE** that because

18

the statements were essentially the only "opinions" in the record from Plaintiff's cardiologists, there was no error in the ALJ's decision to give these statements substantial weight, as both were made by cardiologists involved in Plaintiff's treatment and both indicated Plaintiff's condition was not disabling because he could return to work.

Accordingly, and after considering all Plaintiff's arguments, I **CONCLUDE** the decision of the ALJ was supported by substantial evidence.

## V. CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I **RECOMMEND** that:[2]

 (1) Plaintiff's motion for judgment on the pleadings [Doc. 10] be **DENIED**.

 (2) The Commissioner's motion for summary judgment [Doc. 14] be **GRANTED**.

 (3) The Commissioner's decision denying benefits be **AFFIRMED**.

*s/ Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[2] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).